UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
FRANCESCA MAZELLA,

                     Plaintiff,                              02 CV 7391 (CLB)

       - against -

                                                  ***Memorandum and Order***

FAIRFIELD EQUINE ASSOCIATES, P.C.,
and MARK R. BAUS, D.V.M.,

                     Defendant.
-------------------------------------------------------x
Brieant, J.

      By motion filed in this diversity case controlled by Connecticut law, on March 30, 2005, (Doc. #28), and fully submitted on July 15, 2005, Defendants Fairfield Equine Associates, P.C. ("Fairfield") and Mark R. Baus, D.V.M., move under Fed. R. Civ. P. 56 for summary judgment in their favor. Plaintiff, Francesca Mazella, filed Opposition papers to this motion on June, 15, 2005. Reply papers were filed on July 12, 2005.

      The following well pled facts are assumed to be true for purposes of this motion only. This is a veterinary malpractice suit. Plaintiff sues to recover damages for personal injuries she claims to have suffered by reason of Defendants' negligence in failing properly to diagnose and treat Plaintiff's horse.

      Ms. Mazella was a horse trainer and riding instructor employed at Lionshare Farm in Greenwich, Connecticut. Her horse, "Melvin," was boarded at the farm as a part of her compensation package. Ms. Mazella was a member of the American Horse Shows Association ("AHSA"), and competed in shows and exhibitions using Melvin.

1

In 1999, Melvin, an Oldenburg gelding, was purchased untrained in Germany at a cost of $20,000. Melvin was brought to Lionshare Farm to be trained as a show horse, in the hunter-jumper class, and once fully trained and conditioned as such at Lionshare, then to be resold for a profit as a business investment. Peter Leone, the principal of Lionshare was an Olympic Gold Medalist. He maintained a stable of fully trained show horses engaged in international competition.

In June 2000, Ms. Mazella noticed that Melvin was stumbling, moody, seemed lethargic, and had less tail tone. On June 22, 2000, Ms. Mazella called Defendant Fairfield, a corporation of veterinarians with its principal place of business in Connecticut, to obtain the services of a veterinarian for Melvin. Dr. Mitchell came to Lionshare and examined Melvin on June 23, 2000. Following the examination, Dr. Mitchell provided no diagnosis and recommended the use of a magnetic blanket. Dr. Mitchell informed Ms. Mazella that while Melvin could no longer compete, he could still be ridden in training.

Between June 23, 2000 and July 17, 2000, Melvin's condition deteriorated. Ms. Mazella called Defendant again on July 17, 2000. On July 18, 2000, Dr. Mitchell again examined Melvin. At that point, Dr. Mitchell had no diagnosis, but tentatively suggested injecting Melvin's hocks.

Dr. Mitchell examined Melvin again on September 14, 2000. He drew a blood sample to test Melvin for Lyme disease. Ms. Mazella claims and Dr. Mitchell denies, that he told her that Melvin could be ridden, "but at the walk only." The next day, September 15, 2000, the Assistant

2

Barn Manager led Melvin under lead line to Ms. Mazella, as she observed his walk for approximately 1/8 of a mile. Melvin exhibited a normal gait at that time. Ms. Mazella then mounted Melvin and proceeded to ride in a riding ring at the walk. After about a minute, Melvin's hindquarters gave way without warning and the horse collapsed, falling on Plaintiff. As a result of the fall, Ms. Mazella suffered serious and permanent brain damage, damage to her nervous system, an impairment of speech and motor functions, as well as mental anguish, and was unable to continue in her employment at Lionshare Farm. Defendant Dr. Baus did not see or treat Melvin until February 20, 2001.

Plaintiff filed her complaint on September 13, 2002. She claims that Defendants were negligent in their examination and treatment of Melvin and in their failure to warn of the danger of riding a horse in Melvin's condition. Plaintiff now claims, and Defendants deny, that Melvin had an undiagnosed case of Equine Protozoal Myeloencephalitis ("EPM"). While she was an experienced rider and teacher of equitation, with knowledge of all the ordinary risks of injury associated with her work, she was unaware that Melvin had EPM, which added an unknown and unanticipated danger. EPM can be diagnosed only through blood testing done by a veterinarian.

Plaintiff claims that a reasonably skilled veterinarian acting with reasonable care in light of the symptoms shown by the horse and described by Ms. Mazella, should have tested for EPM. This was concededly not done. Defendants therefore missed the diagnosis. Had he known Melvin had EPM, Dr. Mitchell, in the exercise of reasonable care would not have informed Ms. Mazella that the horse was safe to be ridden at a walk. Plaintiff claims that Defendants' acts and

omissions were negligent, and the proximate cause of Plaintiff's injuries. As noted, Defendants deny that the horse had EPM and deny that Plaintiff was told she could ride the horse at a walk.

Defendants deny negligence, and contend that Dr. Mitchell had no duty to warn Plaintiff of the danger, because Ms. Mazella herself was fully knowledgeable, responsible for warning all of her students of the risks of horseback riding, and contributorily negligent.

Defendants also contend that under Connecticut law, they cannot be held liable for liable for Ms. Mazella's injuries because Connecticut General Statute Section 52-557, discussed below, provides that a rider assumes the risk when he or she engages in equestrian sports, and that under this statute, the only person against whom a claim for personal injury may be brought is the person who provides the horse. Since Ms. Mazella provided her own horse, they contend they cannot be held liable.

## *Discussion*

Fed. R. Civ. P. 56(c) provides that summary judgment shall be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In evaluating the record to determine whether there is a genuine issue as to any material fact, 'the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor."
*Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986). The party

moving for summary judgment has the initial burden of establishing that there are no genuine issues of material fact. *See Celotex Corp. V. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has met its burden, "an adverse party may not rest upon mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided...must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986). To satisfy this standard, the adverse party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *see also St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000).

Mindful of this standard, the Court now turns to the issues of this case. Plaintiff contends and this Court agrees that the relationship between the parties falls under the common law professional malpractice standard announced in Connecticut case law, rather than Section 52-557. Disputed material issues of fact applying this standard preclude summary judgment:

> Malpractice is defined as: the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those serviced...Furthermore malpractice presupposes some improper conduct in the treatment or operative skill or failure to exercise requisite medical skill.
> *Boone v. William W. Backus Hospital*, 272 Conn. 551, 562-563, 864 A. 2d 1, 12 (2005).

*Boone* is a medical malpractice case. This Court concludes that the veterinary and medical malpractice standards of care are indistinguishable, and Defendants owed the owner of Melvin the "degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services." *Id.* at 563 (*citing Gold v. Greenwich Hospital Assn.*, 262 Conn. 248, 254, 811 A.2d 1266 (2002)).

While the reported Connecticut case law dealing with the veterinarian standard of care is sparse, implicit at the very least in that case law is the rule that a veterinarian must use reasonable skill and care when treating an animal. *See* 32 Am. Jur. 3d 351, §5. In *Liotta v. Segur*, 2004 Conn. Super. LEXIS 737 (2004) the court outlined three "levels of tortious conduct [of a veterinarian] which might be seen in bringing harm to one's dog." *Liotta* at 3. The first level was defined as: "[W]hen the conduct would present as pure negligence with neither malice toward the pet nor intent to produce emotional distress to the owner." Similarly, in *Alteri v. Nanavati*, 41 Conn. Supp. 317, 573 A. 2d 359, the court allowed a claim against a veterinarian who performed unwanted surgery on plaintiff's pet to survive summary judgment and move forward on a veterinary malpractice theory. *See Alteri* at 360.

At least implicitly, the standard used in Connecticut as to veterinarians is the same standard of reasonable care and skill applied to physicians in that state. Reason dictates that if it were not, then the Connecticut courts would have so held in cases such as *Alteri* and *Liotta*.

Were this Court to conclude, contrary to fact, that there is no clearly articulated standard of care in Connecticut statute or case law with respect to veterinary medicine, the Court may apply a wide variety of legal authorities including the law of the forum state, which in this case, is New York. See Wright & Miller, Fed. Prac. & Proc, 2d, Ch. 14 § 4507.

With respect to veterinary medicine, the New York standard of care is explicit. *Restrepo, et al. v. The State of New York*, 146 Misc. 2d 349, (N.Y. Ct. Cl. 1989) aff'd 179 A.D. 2d 804 (3d Dept. 1992) (veterinarian breached duty of reasonable care when he broke off a needle in horse's neck, realized that he did, and did not attempt to remove it for an extended time, resulting in death of the animal; held that the "reasonableness standard" applied to medical malpractice claims also applies to cases alleging veterinary malpractice: "[A] veterinarian must use 'reasonable and ordinary care' and diligence" when treating his or her animal patients). *See Id.* at 10 *quoting Boom v. Reed,* 69 Hun. 426, 428. See also *Kenny Jr. v. Lesser*, 281 A.D. 2d 853 (3d Dept. 2001); (upholding a jury award in malpractice action against veterinary, held, "Following a trial, the jury found that defendants had departed from reasonable standards of veterinary care regarding their treatment of plaintiff's horse, that this departure proximately caused his death, and that his fair market value in October 1993 was $100,000"). *Kenny Jr.* at 2. Clearly the law of New York is to the effect that the standard of care owed is the same in medical and veterinary malpractice cases.

There are disputes as to whether Defendant Fairfield exercised reasonable care under the circumstances. Defendants contend that no evidence has been brought that Melvin

actually had Equine Protozoal Myeloencephalitis, and they offer their own expert testimony to that effect. But, Plaintiff proffers expert testimony to the contrary and asserts that Melvin did have Equine Protozoal Myeloencephalitis. Among Plaintiff's supporting evidence is a report by Dr. Kenneth Seeber, who examined Melvin in March 2001, (more than five months after the accident) and diagnosed Equine Protozoal Myeloencephalitis, for which he treated Melvin. Dr. Seeber based his medical conclusions on testimony relating to Dr. Mitchell's three assessments, Dr. Baus' evaluation, as well as reports from Tufts' University School of Veterinary Medicine by its Drs. Mazan, McDonnell, and DeWitt, who examined Melvin on March 23, 2004. Whether, and if so, when, the horse had Equine Protozoal Myeloencephalitis presents a disputed issue of fact that must be decided at trial by a jury upon presentation of all of the relevant evidence. A jury will also decide whether Dr. Mitchell exercised reasonable care in his evaluation and treatment of Melvin, and whether Plaintiff's claim of veterinary malpractice has merit.

Defendants assert an assumption of risk as a matter of law, as a complete defense to Plaintiff's claims, relying on Connecticut General Statute Section 52-557, which reads in relevant part:

> Each person engaged in recreational equestrian activities shall assume the risk and legal responsibility for any injury to his person or property arising out of the hazards inherent in equestrian sports, unless the injury was proximately caused by the negligence of the person providing the horse or horses to the individual engaged in recreational equestrian activities or the failure to guard or warn against a dangerous condition, use, structure or activity by the person providing the horse or horses or his agents or employees. C.G.S.A. §52-557p.

Defendants argue that Ms. Mazella's injury resulted from a risk she assumed as one of the "hazards inherent in equestrian sports." *See* Conn. Gen. Stat. 52-557p. This argument is unavailing. A "hazard inherent in equestrian sports" is that a healthy horse might stumble, fall, buck or shy. The statute was not intended to serve as a defense to a veterinarian malpractice suit. Rather, the statute "was simply designed to protect the owners and operators of horse farms from claims which arise from the unavoidable risks inherent in equestrian activities." *See Saccente v. La Flamme, et al.*, No. CV010075730, 2002 Conn. Super. LEXIS 3630, at *13 *quoting* 36 S. Proc., Pt. 10, 1993, Sess. P. 139, remarks of Senator Jepsen, and holding that as part of the consideration for providing riding lessons to the minor injured party, father agreed to indemnify and hold harmless defendants from any and all loss by reason of liability for damages arising from the use of horses, equipment, or the facility).

Conn. Gen. Stat. 52-557 does not bar this Plaintiff as the owner who retained the veterinary to furnish professional services, from asserting a malpractice claim against an allegedly negligent veterinarian. Under the plain meaning of the statute, it is not a normal hazard inherent in equestrian activities, that a veterinarian might engage in malpractice resulting in misdiagnosis of an acute disease which caused a foreseeable accident and injury to the horse or the rider.

This Court concludes that a veterinarian's failure to properly diagnose a horse's illness is outside the scope of protection afforded by the assumption of risk statute, Section 52-557.

Defendants contend separately that Ms. Mazella's training and experience relieved Dr. Mitchell of any duty to warn. As noted earlier, the heightened risk of injury due to undetected disabling disease in a riding horse is not within "those commonly appreciated risks which are inherent in and arise out of the sport generally and flow from such participation," *Morgan v. State of New York*, 90 N.Y.2d 421 (1997). Clearly Ms. Mazella, a professional in the field, was acutely aware of the inherent risks.* A jury may find she was unaware of the additional risk of collapse due to EPM, and that Dr. Mitchell, having superior knowledge, did in fact have a duty to warn. See *Dorking Genetics v. U.S.*, 76 F.3d 1261 (2nd Cir. 1996) (holding that under New York law veterinarian had an obligation to give full information and warning regarding cattle he had examined under contract for plaintiff, although plaintiff was an experienced herdsman, and that information or knowledge available to a plaintiff does not relieve defendant of contract obligations. *Id.* at 1270. That Ms. Mazella was an experienced horsewoman does not absolve Defendant with his superior professional knowledge, of his responsibility to provide reasonable veterinary care, to detect EPM, if indeed it was present, and warn her of this enhanced and extraordinary risk of injury.

*This country wisdom is reflected in the well known verse:
 "There ain't a horse that can't be rode
  And there ain't a rider that can't be throw'd." (Source unknown)

Defendants are not precluded from seeking to show contributory negligence of the Plaintiff at trial. On the present record her negligence, if such there was, does not seem to approach fifty percent.

Defendant Dr. Baus examined Melvin for the first time on February 20, 2001--five months after the accident. (See Plaintiff's Concession, Transcript, 7/15/05 p.21-22). No action or inaction of Dr. Baus could be a proximate cause of the injuries, and he is entitled to summary judgment in his favor.

## *Conclusion*

Defendants' motion for summary judgment with respect to Fairfield Equine Associates, P.C. is denied for the foregoing reasons. The action against Dr. Baus is dismissed. The Court declines to make the finding contemplated by Rule 54(b) Fed.R.Civ.P. This case is set for trial on 24 hours notice on and after November 21, 2005. Counsel is directed to submit *voir dire* questions and requests to charge at their earliest convenience.

 X

   X

     X

SO ORDERED.
Dated: White Plains, New York
　　　　October 3, 2005

　　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　Charles L. Brieant, U.S.D.J.